241 P.3d 1256 (2010)
Linda EASTWOOD, dba Double KK Farm, Petitioner,
v.
HORSE HARBOR FOUNDATION, INC., a Washington corporation; Maurice Allen Warren, a single person; and Katherine Daling and Michael Daling, a husband and wife, and the marital community composed thereof, Respondents.
No. 81977-7.
Supreme Court of Washington, En Banc.
Argued September 24, 2009.
Decided November 4, 2010.
*1258 David P. Horton, Law Office of David P. Horton Inc. PS, Silverdale, WA, for Petitioner.
Leslie Clay Terry, III, Law Offices of Leslie Clay Terry, III, Bellevue, WA, for Respondents.
*1259 Harold T. Hartinger, Attorney at Law, Tacoma, WA, amicus counsel for Harold T. Hartinger.
FAIRHURST, J.
¶ 1 Since the 1800s, lessors of real property in Washington have been able to recover damages for the tort of waste. In this case, however, the Court of Appeals interpreted our jurisprudence on the economic loss rule and concluded that lessor Linda Eastwood was limited to contractual remedies for the damage done to her horse farm by lessee Horse Harbor Foundation, Inc. See Eastwood v. Horse Harbor Found., Inc., noted at 144 Wash.App. 1009, 2008 WL 1801332. The Court of Appeals also held that Horse Harbor's employee and board directors could not be individually liable for breach of contract. We reverse. The availability of a tort remedy depends on the existence of a tort duty arising independently of a contract's privately negotiated terms, not on whether an injury can be labeled an economic loss. Because the duty to not cause waste is a tort duty independent from a lease's covenants, Eastwood had a cause of action for waste, and the trial court properly concluded she may recover tort damages from Horse Harbor's employee and two of its board directors.

I. FACTUAL AND PROCEDURAL HISTORY
¶ 2 Eastwood owns the Double KK Farm horse farm in Poulsbo, Washington. Horse Harbor, a nonprofit organization incorporated in 1997 under the Washington Nonprofit Corporation Act, chapter 24.03 RCW, cares for abused and abandoned horses. Maurice Allen Warren is Horse Harbor's paid manager, and Katherine and Michael Daling were two of Horse Harbor's corporate directors.
¶ 3 Eastwood and Horse Harbor entered into a lease for a portion of the Double KK, with covenants obligating Horse Harbor to maintain the farm and to return it to Eastwood in good condition. Eastwood accepted a rental rate below fair market value in exchange for Horse Harbor's pledge to maintain the property. But "there was a broad, persistent, and systemic failure" to maintain the leasehold, according to the trial court. Clerk's Papers (CP) at 131. After moving 15 to 16 horses to the farm, Horse Harbor permitted manure and urine to accumulate, and the Kitsap County Health District cited Horse Harbor for unlawful burning of solid waste and improper management of horse manure. Horse Harbor also failed to keep the farm and its improvements properly drained, resulting in pools of standing water and accumulating mud. Other maintenance problems included broken fencing, a damaged riding arena floor, and the horses chewing wood surfaces.
¶ 4 Members of Horse Harbor's board of directors, including the Dalings, had the opportunity to observe the farm's condition. The board received written complaints and a video from Eastwood documenting maintenance issues. The Dalings visited the Double KK frequently. At one point, the board took a walking tour of the Double KK and then met to discuss the growing dispute and the legal ramifications. At the meeting, six people were present, including Warren and the Dalings. The board took no action.
¶ 5 Eastwood sued for breach of lease, the commission of waste, and negligent breach of a duty to not cause physical damage to the leasehold. She named Horse Harbor, Warren, and the Dalings as defendants. Following a bench trial, the trial court found Horse Harbor committed waste and breached the lease covenant to maintain the leasehold. The court found Warren and the Dalings were grossly negligent and therefore individually liable for the damage they proximately caused. At no point did the court or the parties raise the economic loss rule.
¶ 6 On appeal, Horse Harbor, Warren, and the Dalings argued that the trial court erred by finding that their conduct rose to the level of gross negligence. They retried the case, rehashing the trial testimony and exhibits. They also argued that Horse Harbor's corporate form protected Warren and the Dalings from being held individually liable. At no point did they cite the economic loss rule.
¶ 7 The Court of Appeals did not address Eastwood's claim for waste or cite the waste statute, RCW 64.12.020, which gives a lessor a right of action for damages if the lessee *1260 commits waste. See Eastwood, 2008 WL 1801332. On its own motion and without argument, the court cited Alejandre v. Bull, 159 Wash.2d 674, 153 P.3d 864 (2007), our most recent case discussing the economic loss rule, a doctrine that has attempted to describe the dividing line between the law of torts and the law of contracts.
¶ 8 The Court of Appeals characterized Eastwood's claims as economic losses because they "result[ed] from [Horse Harbor's] actions that led to damages and breach of the lease agreement." Eastwood, 2008 WL 1801332, at *2. Based on these circumstances, the court held the economic loss rule applied and limited Eastwood to recovery only for breach of lease, and Warren and the Dalings could not be individually liable for the damages. Id. at *2-*3. The Court of Appeals denied Eastwood's motion for reconsideration.
¶ 9 We granted Eastwood's petition for review. Eastwood v. Horse Harbor Found., Inc., 165 Wash.2d 1016, 199 P.3d 411 (2009).[1]

II. ISSUES
A. When a lessee breaches a lease covenant requiring the lessee to repair and maintain the leased property, is the lessor limited to contract remedies, or may the lessor also recover for the tort of waste?
B. Are employees of a lessee liable for the waste they cause?
C. Does RCW 4.24.264 insulate the directors of a lessee nonprofit corporation from liability for permitting waste that rises to the level of gross negligence?
D. Is Eastwood entitled to attorney fees?

III. ANALYSIS
A. When a lessee breaches a lease covenant requiring the lessee to repair and maintain the leased property, is the lessor limited to contract remedies, or may the lessor also recover for the tort of waste?
¶ 10 "Waste is a tort." William Woodfall, The Law of Landlord and Tenant 469 (6th ed. 1822). Arising in the context of a lease for real property, waste is a breach of the lessee's duty to avoid "an unreasonable and improper use" of the leasehold and "to treat the premises in such a manner that no harm be done to them, and that the estate may revert to those having the reversionary interest, without material deterioration." Moore v. Twin City Ice & Cold Storage Co., 92 Wash. 608, 611, 159 P. 779 (1916). Only damage rising to the level of "substantial injury" is considered waste. Id. A lessor thus has a right to the reversionary interest in the property remaining free from substantial material injury. Rights and remedies go together, and a statutory remedy for waste has been available to lessors in Washington since the first territorial assembly enacted one in 1854. See Laws of 1854, XLIV, § 403. The current landlord-tenant waste statute, RCW 64.12.020, provides, "If a guardian, tenant in severalty or in common, for life or for years, or by sufferance, or at will, or a subtenant, of real property commit waste thereon, any person injured thereby may maintain an action at law for damages."
¶ 11 A lease is a contract as well as a conveyance of a property interest, and the tort law duty to not cause waste is usually supplemented by a lease covenant allocating responsibility for repairs between the lessor and the lessee. See 17 William B. Stoebuck & John W. Weaver, Washington Practice: Real Estate: Property Law § 6.39, at 367 (2d ed. 2004) ("A well drafted lease will make provision for repairs, creating a contractual duty for either the landlord or tenant to make repairs or apportioning repair duties between the parties."). When a lessee breaches such lease provisions and consequently harms the property, the issue is whether the lessor's injury is only an economic loss remediable under the law of contracts or whether it is also the tort of "waste" within the meaning of RCW 64.12.020. Stated another way, can a breach of lease simultaneously be a breach of a tort duty that arises independently of the lease's terms? We hold it can because an independent tort *1261 duty can overlap with a contractual obligation.

1. The "economic loss rule"

¶ 12 In reaching the opposite conclusion, the Court of Appeals picked several statements from Alejandre to support its analysis. Alejandre defined an economic loss as an injury in a contractual relationship "where the parties could or should have allocated the risk of loss, or had the opportunity to do so." 159 Wash.2d at 687, 153 P.3d 864. The lease between Eastwood and Horse Harbor actually allocated the risk of the property falling into disrepair, as the lease assigned most responsibilities for maintenance to Horse Harbor. The Court of Appeals thought the breach of this contractual arrangement was therefore an economic loss under Alejandre. The court also noted the statements from Alejandre that "the purpose of the economic loss rule is to bar recovery for alleged breach of tort duties where a contractual relationship exists and the losses are economic losses," and "[i]f the economic loss rule applies, the party will be held to contract remedies, regardless of how the plaintiff characterizes the claims." Id. at 683, 153 P.3d 864. Seeing both a contractual relationship and an economic loss, the Court of Appeals believed that Alejandre therefore compelled a holding that Eastwood's only remedy was a recovery for breach of lease. Eastwood, 2008 WL 1801332, at *2. The Court of Appeals' broad reading of this court's jurisprudence on the economic loss rule, while perhaps understandable, is not correct.
¶ 13 The term "economic loss rule" has proved to be a misnomer. It gives the impression that this is a rule of general application and any time there is an economic loss, there can never be recovery in tort. This impression is too broad for two reasons. First, it pulls too many types of injuries into its orbit. When a contractual relationship exists between the parties, any harm arising from that relationship can be deemed an economic loss for which the law of tort never provides a remedy. Further, any injury that can be monetized can be thought of as an economic loss presumptively excludable under the rule because the legislature has defined "`[e]conomic damages'" as "objectively verifiable monetary losses, including medical expenses, loss of earnings, burial costs, loss of use of property, cost of replacement or repair, cost of obtaining substitute domestic services, loss of employment, and loss of business or employment opportunities." RCW 4.56.250(1)(a).
¶ 14 Second, and most importantly, the broad application of the economic loss rule does not accord with our cases. Economic losses are sometimes recoverable in tort, even if they arise from contractual relationships. For instance, we recognize the torts of intentional and wrongful interference with another's contractual relations or business expectancies, Commodore v. University Mechanical Contractors, Inc., 120 Wash.2d 120, 137, 839 P.2d 314, 322 (1992); wrongful discharge in violation of public policy, Smith v. Bates Technical College, 139 Wash.2d 793, 803-04, 991 P.2d 1135 (2000); failure of an insurer to act in good faith, American States Insurance Co. v. Symes of Silverdale, Inc., 150 Wash.2d 462, 469, 78 P.3d 1266 (2003); fraudulent concealment, Obde v. Schlemeyer, 56 Wash.2d 449, 452, 353 P.2d 672 (1960); fraudulent misrepresentation, Beckendorf v. Beckendorf, 76 Wash.2d 457, 462, 457 P.2d 603 (1969); negligent misrepresentation, ESCA Corp. v. KPMG Peat Marwick, 135 Wash.2d 820, 825, 959 P.2d 651 (1998); breach of an agent's fiduciary duty to act in good faith, Moon v. Phipps, 67 Wash.2d 948, 956, 411 P.2d 157 (1966); and negligent real estate appraisal, Schaaf v. Highfield, 127 Wash.2d 17, 27, 896 P.2d 665 (1995). "We will not overrule such binding precedent sub silentio." State v. Studd, 137 Wash.2d 533, 548, 973 P.2d 1049, 1056 (1999). Thus, the fact that an injury is an economic loss or the parties also have a contractual relationship is not an adequate ground, by itself, for holding that a plaintiff is limited to contract remedies.

2. The rule is merely a case-by-case question of whether there is an independent tort duty

¶ 15 The question is how a court can distinguish between claims where a plaintiff is limited to contract remedies and cases *1262 where recovery in tort may be available. A review of our cases on the economic loss rule shows that ordinary tort principles have always resolved this question. An injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract. The court determines whether there is an independent tort duty of care, and "`[t]he existence of a duty is a question of law and depends on mixed considerations of logic, common sense, justice, policy, and precedent.'" Snyder v. Med. Serv. Corp. of E. Wash., 145 Wash.2d 233, 243, 35 P.3d 1158 (2001) (internal quotation marks omitted) (quoting Lords v. N. Auto. Corp., 75 Wash.App. 589, 596, 881 P.2d 256 (1994)); see also Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc., ___ Wash.2d ___, ___-___, ___ P.3d ___ (2010). Where this court has stated that the economic loss rule applies, what we have meant is that considerations of common sense, justice, policy, and precedent in a particular set of circumstances led us to the legal conclusion that the defendant did not owe a duty. When no independent tort duty exists, tort does not provide a remedy.
¶ 16 For example, Alejandre v. Bull involved a real estate sales contract, and the Alejandres (buyers) complained that Bull (seller) failed to tell them about a defect in the home's septic tank. 159 Wash.2d at 677, 153 P.3d 864. The Alejandres sued for negligent misrepresentation, and so the issue was whether Bull owed them a "duty of care under the Restatement (Second) of Torts § 552 (1977)," which is the duty to use ordinary care in obtaining or communicating information during a transaction. 159 Wash.2d at 686, 153 P.3d 864.
¶ 17 Although we couched our analysis in terms of looking for an "exception" to the economic loss rule, the core issue was whether Bull, as the home seller, was under a tort duty independent of the contract's terms. The contract between Bull and the Alejandres contained ample disclosures about the home, the Alejandres agreed that "`[a]ll inspection(s) must be satisfactory to the Buyer, in the Buyer's sole discretion,'" id. at 678, 153 P.3d 864 (alteration in original) (quoting ex. 4), the Alejandres acknowledged "their duty to `pay diligent attention to any material defects which are known to Buyer or can be known to Buyer by utilizing diligent attention and observation,'" id. at 679, 153 P.3d 864 (quoting ex. 5), and the Alejandres had their own inspection done. With significant information communicated about the home in the course of contractual negotiations, Bull had no independent tort duty to obtain or communicate even more information during a transaction. The contract sufficed, and the Alejandres' negligent misrepresentation claim did not survive. We recognized, however, that Bull's independent duty to not commit fraud persisted, and we would have allowed the Alejandres to sue for fraudulent concealment if they had offered enough evidence to support that tort claim. Id. at 689-90, 153 P.3d 864.
¶ 18 In Berschauer/Phillips Construction Co. v. Seattle School District No. 1, 124 Wash.2d 816, 819-20, 881 P.2d 986 (1994), the general contractor for a school construction project sued the architect, structural engineering company, and construction inspector for negligence. As a result of the defendants' inadequate design plans and faulty inspection work, the contractor claimed that it spent more money than expected and also endured delays in construction, with $3.8 million in losses. Id. at 819, 881 P.2d 986. The contractor conceded these were economic losses. Id. But we did not automatically dismiss the contractor's claims. Rather, we carefully weighed the public policy considerations to decide whether the defendants owed an independent tort duty to avoid the contractor's risk of economic loss. See id. at 826-28, 881 P.2d 986. We held that the general contractor could not sue in tort to recover damages for lost profits. Id. at 826, 881 P.2d 986. The contractor's losses were the increased costs of doing business. We reasoned, as a policy matter, that if design professionals were under a tort duty to avoid a risk of increased business costs, the construction industry could not rely on the risk allocations in their contracts and would have an insufficient incentive to negotiate risk. The case might have been different if a structure had collapsed.
*1263 ¶ 19 In Atherton Condominium Apartment-Owners Ass'n Board of Directors v. Blume Development Co., 115 Wash.2d 506, 799 P.2d 250 (1990), plaintiff condominium owners claimed fraudulent concealment, negligent construction, and negligent design. Fraudulent concealment in a real estate transaction is a cause of action that has long been recognized in Washington. Perkins v. Marsh, 179 Wash. 362, 367-68, 37 P.2d 689 (1934). Independent of the obligations in a lease or a residential real estate sales contract, the vendor or lessor has an affirmative duty to "disclose material facts," of which the vendor or seller has knowledge, and which are "not readily observable upon reasonable inspection by the purchaser" or lessee. Hughes v. Stusser, 68 Wash.2d 707, 711, 415 P.2d 89 (1966); see also Obde, 56 Wash.2d at 452, 353 P.2d 672. Thus, it is a well-rooted tort duty that arises independently of the contract, and we recognized in Atherton that the plaintiffs could pursue their fraud claim. 115 Wash.2d at 525-26, 799 P.2d 250.[2] As for the plaintiffs' claim of negligent construction, however, we held they could not recover, because the defendant builder did not owe an independent tort duty to avoid defects in construction quality. Id. at 526, 799 P.2d 250. Similarly, we rejected the plaintiffs' claim for negligent design against the architect because they failed to show that the architect "breached any duty of care and that such breach was the proximate cause of the alleged damages." Id. at 534 n. 17, 799 P.2d 250.
¶ 20 In Stuart v. Coldwell Banker Commercial Group, Inc., 109 Wash.2d 406, 417, 745 P.2d 1284 (1987), we decided whether plaintiffs could recover damages in tort for construction defects in a condominium complex. Id. We recognized that original purchasers could recover damages from the condominium builder-vendor for breach of an implied warranty of habitability under the law of contracts. Id. at 421, 745 P.2d 1284. But, with an eye toward public policy considerations, we refused to recognize a tort duty to avoid defects in quality, lest builder-vendors "become the guarantors of the complete satisfaction of future purchasers." Id. We cautioned, however, that when a court considers whether recovery in tort is permissible, "the determinative factor should not be the items for which damages are sought, such as repair costs." Id. at 420, 745 P.2d 1284. The ultimate question was whether the builder-vendor was under an independent tort duty to avoid the condominium owners' injury, and we concluded not.
¶ 21 The economic loss rule in Washington was heavily influenced by the United States Supreme Court opinion in East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), and that case also rests on the proposition that an injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract. In East River, the plaintiff ship-chartering companies alleged that the defendant shipbuilder sold them oil supertankers with defective turbines, and they sought to recover under a strict liability theory of tort, with damages for the cost of repairs as well as the revenues lost when the tankers were not working. Id. at 861, 106 S.Ct. 2295. The defendant argued that the plaintiffs were limited to their contract damages. Under products liability, the manufacturer is strictly liable "where a product `reasonably certain to place life and limb in peril,' distributed without reinspection, causes bodily injury." Id. at 866, 106 S.Ct. 2295 (quoting MacPherson v. Buick Motor Co., 217 N.Y. 382, 389, 111 N.E. 1050 (1916)). The court noted a manufacturer is liable in tort for product defects "because `public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market.'" Id. (quoting Escola v. Coca Cola Bottling Co. of Fresno, 24 Cal.2d 453, 462, 150 P.2d 436 (1944) (Traynor, J., concurring)). "For similar reasons of safety, the manufacturer's duty of care was broadened to include protection against property damage." Id. at 867, 106 S.Ct. 2295. The question *1264 arose "whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation." Id. (emphasis added).
¶ 22 The court deemed the plaintiffs' loss an economic loss because "the injury sufferedthe failure of the product to function properlyis the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." Id. at 868, 106 S.Ct. 2295.
¶ 23 But the court did not simplistically rest its holding on its finding that the plaintiffs' losses were economic losses. Although the law of contracts applied, the court also inquired whether there was a tort duty independent of any contractual terms. As a policy matter, the court preferred warranty law's "built-in limitation on liability" and sought to protect a manufacturer from worrying about "the expectations of persons downstream who may encounter its product." Id. at 874, 106 S.Ct. 2295. Based on these considerations, the court "h[eld] that a manufacturer in a commercial relationship has no duty under either a negligence or a strict products-liability theory to prevent a product from injuring itself." Id. at 871, 106 S.Ct. 2295.
¶ 24 In sum, the economic loss rule does not bar recovery in tort when the defendant's alleged misconduct implicates a tort duty that arises independently of the terms of the contract.[3] In some circumstances, a plaintiff's alleged harm is nothing more than a contractual breach or a difference in the profits, revenue, or costs that the plaintiff had expected from a business enterprise. In other circumstances, however, the harm is simultaneously the result of the defendant breaching an independent and concurrent tort duty. Thus, while the harm can be described as an economic loss, it is more than that: it is an injury remediable in tort.[4] The test is not simply whether an injury is an economic loss arising from a breach of contract, but rather whether the injury is traceable also to a breach of a tort law duty of care arising independently of the contract. The court defines the duty of care and the risks of harm falling within the duty's scope. Sheikh v. Choe, 156 Wash.2d 441, 448, 128 P.3d 574 (2006).
¶ 25 Other states use the same approach. See, e.g., Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc., 320 S.C. 49, 463 S.E.2d 85, 88 (1995) ("A breach of a duty arising independently of any contract duties between the parties ... may support a tort action."); Congregation of Passion, Holy Cross Province v. Touche Ross & Co., 159 Ill.2d 137, 636 N.E.2d 503, 514, 201 Ill.Dec. 71 (1994) ("Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty."); Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 551, 593 N.E.2d 1365, 583 N.Y.S.2d 957 (1992) ("A legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship."). In fact, we agree with the Supreme Court of Colorado's belief "that a more accurate designation of what is commonly termed the `economic loss rule' would be the `independent duty rule.'" Town of Alma v. Azco Constr., Inc., 10 P.3d 1256, 1262 n. 8 (Colo. 2000).
¶ 26 Although we find clarity in thinking of the problem in terms of an independent duty, we see potential difficulty, when a defendant has obligations under both *1265 the contract terms and an independent tort duty, in distinguishing between a harm that implicates only the contract and a harm that implicates the independent duty as well. It is a factual question of proximate causation. As a matter of law, the court defines the duty of care and the risks of harm falling within the duty's scope. Sheikh, 156 Wash.2d at 448, 128 P.3d 574. As a matter of fact, the jury decides whether the plaintiff's injury was within the scope of the risks of harm, which the court has held the defendant owed a duty of care to avoid. Rikstad v. Holmberg, 76 Wash.2d 265, 270, 456 P.2d 355 (1969).
¶ 27 In deciding whether a reasonable juror could find causation, an analytical tool that a court can use is the risk-of-harm approach utilized in Stuart and our product liability cases. In Stuart, we concluded that a condominium builder did not owe a duty to avoid a risk of economic loss, which we defined as a mere defect in the bargained-for quality. 109 Wash.2d at 420, 745 P.2d 1284. But we implied that the builder had an independent duty to avoid unreasonable risks of harm to persons and other property. Id. at 420-21, 745 P.2d 1284. To decide whether the plaintiffs' injury fell outside the scope of risks covered by the tort duty, we analyzed "interrelated factors such as [1] the nature of the defect, [2] the type of risk, and [3] the manner in which the injury arose." Id. at 421, 745 P.2d 1284. Applying this risk-of-harm test, we concluded, "The nature of the defect here was that the decks and walkways were not of the quality desired by the buyers. The `injury' or damage suffered was that the decks themselves deteriorated, not through accident or violent occurrence, but through exposure to the weather." Id. Thus, there was no factual question whether the injury was caused by a breach of the duty to avoid risks of physical harm to persons or other property.
¶ 28 Under the Washington product liability act (WPLA), chapter 7.72 RCW, a product manufacturer has a tort duty to avoid product designs and construction that are unreasonably dangerous. RCW 7.72.030. But the WPLA's definition of "`[h]arm'" excludes "direct or consequential economic loss," RCW 7.72.010(6), leaving the law of sales contracts as the sole source of a plaintiff's remedy for economic loss. To differentiate a harm that is an "economic loss" from a harm for which damages are recoverable in tort, the risk-of-harm test determines whether the harm can reasonably be traced back to the tort duty. Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc., 119 Wash.2d 334, 351, 831 P.2d 724 (1992); Wash. Water Power Co. v. Graybar Elec. Co., 112 Wash.2d 847, 866, 774 P.2d 1199, 779 P.2d 697 (1989). When a product defect results in a personal injury or damage to other property, the cause can plainly be a breach of the tort duty. When a product defect results in injury only to the product itself, however, the risk of harm must be carefully analyzed. The WPLA tort duties are implicated if a hazardous product exposes a person or property to an unreasonable risk of harm such that the safety interests of the WPLA are implicated. Touchet Valley, 119 Wash.2d at 353-54, 831 P.2d 724. For example, the sudden collapse of a grain storage building creates "a real, nonspeculative threat to persons and property" and is therefore not a mere economic loss. Id. at 353, 831 P.2d 724. Thus, the availability of a tort remedy depends on the nature of the risk that created the harm.

3. The lack of utility in relying only on strict categories to define economic loss

¶ 29 The alternative to the careful, case-by-case analysis of the independent duty would be a bright-line rule relying strictly on the three categories of injuries we have described before: (1) economic losses, (2) personal injury, and (3) property damage. See, e.g., Alejandre, 159 Wash.2d at 684, 153 P.3d 864. Although these categories can be helpful, they are derived from product liability cases. They can be confusing when removed from their original context. Further, it can be unclear where economic loss ends and property damage begins, and this case provides a good example of that. Eastwood claims harm to real property. But we have held there was an economic loss in cases where the plaintiff complained of a defective septic tank, Alejandre, 159 Wash.2d at 685, *1266 153 P.3d 864; a condominium's construction defects, Atherton, 115 Wash.2d at 512-13, 799 P.2d 250; and deteriorated walkways and decks in a condominium complex, Stuart, 109 Wash.2d at 421, 745 P.2d 1284. All of these involve fixtures and therefore real property.
¶ 30 However, the concurrence written by Chief Justice Madsen argues that a close look at Alejandre, Atherton, and Stuart will reveal the line between economic loss and property damage. The concurrence states that "[i]n these cases, the damages sought were economicconsisting of the costs of repairs to correct the defects and to compensate for additional injury to the property itself caused by the defective conditions." Concurrence (Madsen, C.J.) at 1269-70 (citation omitted). The Madsen concurrence elaborates on its definition of economic loss as the failure to "obtain the benefit of the bargain" and observes that in Alejandre, Atherton, and Stuart "the purchased item failed to meet the buyer's economic expectations because of the defects." Id.
¶ 31 But it was for these same reasons that the Court of Appeals concluded Eastwood's losses are nothing more than economic losses. There was a contract in the form of a lease, and several provisions defined Eastwood's contractual expectations. In the lease, Horse Harbor pledged to "keep and maintain the leased premises and appurtenances in good and sanitary condition and repair during the term of this lease." Ex. 101, at 2. Eastwood assumed responsibility for "[m]ajor maintenance and repair of the leased premises, not due to Lessee's misuse, waste, or neglect or that of his employee, family, agent, or visitor." Id. Eastwood was obligated to repair any part of the leasehold "partially damaged by fire or other casualty," unless the cause was Horse Harbor's "negligence or willful act." Id. Under the surrender covenant, if Horse Harbor did not exercise a purchase option, Horse Harbor promised to "quit and surrender the premises... in as good [a] state and condition as they were at the commencement of this lease, reasonable use and wear thereof and damages by the elements excepted." Id. at 3. These contractual terms indicate Eastwood's expected benefit of the bargain: Horse Harbor would be responsible for most maintenance, and Eastwood would have the leasehold returned to her in good condition. In fact, because Horse Harbor promised to maintain the farm at its own expense, Eastwood agreed to a monthly rent amount that was one-third less than the fair market value. The measure of Eastwood's losses was the cost of repairing the horse farm. Because Eastwood failed to obtain the benefit of her contractual bargain with Horse Harbor and because she sought damages in the form of the cost of repairs, Eastwood's injury was an economic loss by the Madsen concurrence's own definition. Its arguments underscore the difficulties of drawing a line between economic loss and property damage and applying product liability categories to new settings.

4. The duty to not cause waste is a duty that arises independently of the lease covenants

¶ 32 Having described what we now will call the independent duty doctrine, we next must decide whether the duty to not cause waste arises independently of the contract. An early American authority described the duty to not cause waste as an obligation the tenant owes even if the lease covenants say nothing about the issue: "Independently of any express agreement, the law imposes upon every tenant, whether for life or for years, an obligation to treat the premises in such a manner, that no substantial injury shall be done to them." John N. Taylor, A Treatise on the American Law of Landlord and Tenant § 343, at 261 (6th ed. 1873) (emphasis added). This duty not to cause waste has long been recognized in Washington. See McLeod v. Ellis, 2 Wash. 117, 120, 26 P. 76 (1891).
¶ 33 Still, Warren and the Dalings argue that it is novel for a landlord to recover damages under theories of both breach of lease and the tort of waste. But in Washington, we have already allowed a plaintiff landlord to recover under both theories. See, e.g., Fisher Props., Inc. v. Arden-Mayfair, Inc., 106 Wash.2d 826, 726 P.2d 8 (1986). In Fisher Properties, the lease included a covenant where the lessee promised to, "`at its *1267 own expense, make and do all repairs of all kinds, both inside and outside the demised premises ... and keep the same in good order and repair.'" Id. at 829, 726 P.2d 8 (quoting lease at ¶ 8). This same covenant also mentioned waste expressly: "`The Lessee agrees that it will not permit or suffer any waste, damage or injury to the said building or premises.'" Id. (quoting lease at ¶ 8). Still, we permitted the plaintiff lessor to recover for both breach of the lease and waste. Id. at 854-55, 726 P.2d 8. We hold the duty to not cause waste is a tort duty that arises independently of a lease agreement and an aggrieved lessor may pursue damages concurrently under theories of tort and breach of lease. Accord Vollertsen v. Lamb, 302 Or. 489, 508, 732 P.2d 486 (1987). Eastwood thus had a right of action to recover tort damages under RCW 64.12.020.[5]
¶ 34 Because we conclude there existed both a contractual obligation under the lease terms and an independent tort duty, an issue arises whether Eastwood's alleged harm was traceable, as a factual matter, to the independent tort duty. Once the independent duty is held to exist as a matter of law, the connection between the breach and the plaintiff's injury becomes a factual question of proximate cause. After the bench trial in this case, the trial court found that Warren and the Dalings breached their tort duty not to cause waste and that this tortious conduct was the proximate cause of some of the damage to the horse farm. CP at 133 ("This gross negligence resulted in waste and damage to plaintiff's farm and they are liable for the damage it proximately caused."). We think there was ample evidence in the record from which the trial court could reasonably find proximate causation.

B. Are employees of a lessee liable for the waste they cause?
¶ 35 Because Eastwood's claim for waste is not barred, the question arises whether Warren can be individually liable for the waste he caused within the scope of his employment as Horse Harbor's manager. The law is well settled that "an employee who tortiously causes injury to a third person may be held personally liable to that person regardless of whether he or she committed the tort while acting within the scope of employment." 27 Am.Jur.2d Employment Relationship § 409 (2004); accord Finney v. Farmers Ins. Co., 92 Wash.2d 748, 754, 600 P.2d 1272 (1979) (stating that a principal and an agent "are jointly and severally liable for all damages suffered by a plaintiff who has been injured as a result of the agent's negligence"). The trial court found Warren was liable for his gross negligence in permitting waste, and the independent duty doctrine does not bar Eastwood's claim for waste. Warren may be held individually liable.

C. Does RCW 4.24.264 insulate the directors of a lessee nonprofit corporation from liability for permitting waste that rises to the level of gross negligence?
¶ 36 RCW 4.24.264(1) provides that "a member of the board of directors or an officer of any nonprofit corporation is not individually liable for any discretionary decision or failure to make a discretionary decision within his or her official capacity as director or officer unless the decision or failure to decide constitutes gross negligence." The question is whether the actions or omissions of the Dalings, acting as directors of *1268 the Horse Harbor nonprofit corporation, "constitute[d] gross negligence" within the meaning of RCW 4.24.264(1).[6] The Court of Appeals held RCW 4.24.264 is a complete limitation on individual directors' liability for a nonprofit corporation's breach of contract, and only torts could meet the "gross negligence" exception. Eastwood, 144 Wash.App. 1009, 2008 WL 1801332, at *2. According to the Court of Appeals, the trial court erred by holding the Dalings liable, because the trial court made a nonprofit corporate director "individually liable where a breach of contract rose to gross negligence." Id. But the trial court imposed liability on the Dalings only for gross negligence in permitting waste, not for breach of contract:
The degree of neglect, its persistence and visibility, supports a finding that the care exercised by Kay and Michael Daling lack [sic] was substantially and appreciably greater than ordinary negligence. This gross negligence resulted in waste and damage to plaintiff's farm and they are liable for the damage it proximately caused.
CP at 133 (emphasis added). Because gross negligence for a tort falls squarely within the exception enumerated in RCW 4.24.264, the Dalings are individually liable for their gross negligence in permitting waste.[7]

D. Is Eastwood entitled to attorney fees?
¶ 37 Eastwood seeks attorney fees. The lease agreement provided that Horse Harbor would pay Eastwood reasonable attorney fees if Eastwood were to sue Horse Harbor to enforce her rights. Ex. 101, at 3 ("Lessee shall pay all reasonable attorneys' fees necessary to enforce Lessor's rights."). The waste statute also provides for an award of reasonable attorney fees. RCW 64.12.020. We grant Eastwood's request. See RAP 18.1; RCW 4.84.330; Boyd v. Davis, 127 Wash.2d 256, 264-65, 897 P.2d 1239 (1995).

IV. CONCLUSION
¶ 38 An injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract. Because the term "economic loss rule" inadequately captures this principle, we adopt the more apt term "independent duty doctrine." The existence of an independent duty is a question of law for courts to decide. We hold the duty to not cause waste is an obligation that arises independently of the terms of a lease covenant, and sufficient evidence supported the trial court's findings of a causal connection between Eastwood's losses and a breach of this independent duty. Thus, the Court of Appeals was mistaken to hold Eastwood could not recover tort damages for waste. Warren is individually liable for the waste he permitted, even if within the scope of his employment. RCW 4.24.264 does not protect the Dalings from individual liability in this case. We grant Eastwood's request for attorney fees.
WE CONCUR: SUSAN OWENS and JAMES M. JOHNSON, Justices.
MADSEN, C.J. (concurring).
¶ 39 The lead opinion's lengthy discourse on the economic loss rule and its new approach for determining when the rule applies is unnecessary for two reasons. First, we cannot apply the common law economic loss rule to nullify the statutory cause of action for waste without violating separation of powers principles and encroaching on the legislature's authority to establish a cause of action. The issue whether the plaintiff was entitled to bring an action for waste should be resolved entirely on statutory grounds. Second, the injury to property here does not constitute an economic loss within the rule.
¶ 40 RCW 64.12.020 provides: "If a guardian, tenant in severalty or in common, for life or for years, or by severance, or at will, or a subtenant, of real property commit waste thereon, any person injured thereby may *1269 maintain an action at law for damages." This statute plainly provides a statutory cause of action for waste. Many courts have concluded that a statutory cause of action cannot be barred under the economic loss rule, including the Court of Appeals of this state. In Park Avenue Condominium Owners Association v. Buchan Developments, LLC, 117 Wash.App. 369, 382, 71 P.3d 692 (2003), the court stated that the judicially created economic loss rule arose in a context where the legislature had not spoken. "Where the legislature has acted to create rights and remedies, courts cannot enlarge or restrict those rights or remedies" but can interpret an unclear statute in a manner consistent with legislative intent. Id.
¶ 41 Using similar reasoning, the United States District Court for the Western District of Washington held that the economic loss rule did not apply to bar a statutory trade secret misappropriation claim under RCW 19.108.010 et seq. Veritas Operating Corp. v. Microsoft Corp., No. C06-0703-JCC, 2008 WL 474248, at *4 (W.D. Wash. Feb.4, 2008) (unpublished). In a leading opinion on this point, the Florida State Supreme Court held in Comptech International, Inc. v. Milam Commerce Park, Ltd., 753 So.2d 1219 (Fla.2000) that the economic loss rule does not bar statutory causes of action. The Florida court observed that "[i]t is undisputed that the Legislature has the authority to enact laws creating causes of action. If the court limits or abrogates such legislative enactments through judicial policies, separation of powers issues are created, and that tension must be resolved in favor of the Legislature's right to act in this area." Id. at 1222. The court concluded that the economic loss rule did not bar statutory claims for injury resulting from violations of the building code during construction under West's Florida Statutes Annotated § 553.84.
¶ 42 Other cases are similar. See, e.g., Boehme v. United States Postal Service, 343 F.3d 1260 (10th Cir.2003) (economic loss rule has no application to statutory cause of action for unlawful detainer under Colorado law); In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig., No. MDL-1703, 2009 WL 937256, at *9 (N.D.Ill. Apr.6, 2009) (economic loss rule does not bar statutory claims); Wolfe Tory Medical, Inc. v. C.R. Bard, Inc., 2008 WL 541346, at *3 (D.Utah Feb.25, 2008) (unpublished) (statutory trade secret claim not barred by the economic loss rule under Utah law); Stuart v. Weisflog's Showroom Gallery, Inc., 308 Wis.2d 103, 746 N.W.2d 762 (2008) (economic loss doctrine does not bar claims under the Home Improvement Practices Act, Wis. Admin. Code ATCP § 110).
¶ 43 I would hold that the economic loss doctrine cannot be applied to bar a statutory cause of action. The legislature has authority to establish a cause of action, and we would encroach upon its authority to do so if we were to nullify its action by applying the economic loss rule to prohibit a statutory claim.
¶ 44 The lead opinion asserts that my conclusion accounts for only half of the equation because under the parties' arguments there is an issue whether the plaintiff's claim is for waste within the meaning of the statute or instead for the lost benefit under contract, i.e., an economic loss. Lead opinion at 1267 n. 5. The lead opinion believes it is therefore still necessary to look at what legal duties are breached. Id. This is an example of the lead opinion's unnecessary complication of the issues in this case. If the loss qualifies as waste under the statute, the economic loss rule simply cannot bar a plaintiff's claim under the statute. It makes no difference whether the loss would, in the absence of the statute, constitute an economic loss. The economic loss rule would be completely removed from the equation.
¶ 45 The lead opinion incorrectly disposes of the plaintiff's argument that the damage to her property does not fall within the economic loss rule. Under our case law, economic losses are distinguished from personal injury or injury to other property. Alejandre v. Bull, 159 Wash.2d 674, 684, 153 P.3d 864 (2007); Stuart v. Coldwell Banker Commercial Group, Inc., 109 Wash.2d 406, 420-21, 745 P.2d 1284 (1987). In these cases and Atherton Condominium Apartment-Owners Association Board of Directors v. Blume Development Co., 115 Wash.2d 506, 799 P.2d 250 (1990), the damages sought were economic consisting of the costs of repairs to correct the defects and to compensate for *1270 additional injury to the property itself caused by the defective conditions. Thus, the purchaser of the property in each case did not obtain the benefit of the bargainthe purchased item failed to meet the buyer's economic expectations because of the defects. In Stuart, the allegations were that decks, walkways, and railings did not meet uniform building code water-tightness requirements, which resulted in rotting and substantial impairment of the decks, walkways, and railings. In Atherton, the alleged "defects [were] latent structural deficiencies primarily pertaining to the inner construction of the floors and ceilings." Atherton, 115 Wash.2d at 521, 799 P.2d 250. In Alejandre, the septic system of a residence was defective. In each case, the property contracted for purchase was defective and not what the contracting party expected to receive as the benefit of the bargain made.
¶ 46 The present case does not fall within this class of cases. The plaintiff did not purchase property that turned out to contain defects that themselves required repair or that led to further damage to the property itself.[1]
¶ 47 The lead opinion incorrectly states a general rule of law that does not accord with our cases on the economic loss rule. It unnecessarily engages in a long and ultimately confusing discussion of how the economic loss rule is to be applied in the future. The issue that is so exhaustively examined has an easy and straightforward resolution in this case. The economic loss rule should not be applied to bar a statutory cause of action, here the statutory cause of action for waste.
¶ 48 I concur in the result.
I CONCUR: GERRY L. ALEXANDER, Justice.
CHAMBERS, J. (concurring).
¶ 49 I commend the lead opinion's effort to refocus and rename what has heretofore been referred to by this court as the economic loss rule and will hereafter be referred to as the independent duty rule. I concur but write separately to emphasize it is the unique role of this court to decide what the law is and what tort duties are recognized in this state. Brown v. State, 155 Wash.2d 254, 261-62, 119 P.3d 341 (2005) (citing Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)). The independent duty rule was never a rule in the ordinary sense. Rather it described an analytical tool used to assist this court in determining whether to recognize a tort cause of action in the first instance. It does not describe any particular kind, type, class, or character of damages. Finally, this court has only applied what we now call the independent duty doctrine in cases involving product liability and claims arising out of construction or the sale of real estate. Lower courts should be cautious in its application, especially outside of those narrow areas. The role of the trial court is to determine if the duty sought to be enforced is a duty essentially assumed by agreement or a duty imposed by law. That determination will control the remedy.

I
¶ 50 First, I have a cautionary word for any court that attempts to apply contract law and remedies to the exclusion of other applicable bodies of law and remedies. Our jurisprudence has developed slowly and thoughtfully over many centuries. Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. *1271 L.Rev. 457, 468 (1897). In its simplest form we have criminal law and civil law. Oliver Wendell Holmes, Jr., The Common Law 6 (Mark DeWolf Howe ed., 1963) (1881). Although, generally, the government enforces criminal law and the individual enforces civil law, they run parallel and may simultaneously apply to the same event. A wrongful death or a fraud may be both a tort and a crime. Similarly, in civil law we have several bodies of law including contract law and tort law, the former based upon duties voluntarily assumed by agreement and the latter based upon duties imposed by law, and they may simultaneously apply to the same event. Tort duties are important to our society and are imposed for a variety of reasons. We impose these duties to protect innocent parties, to deter hazardous, reckless, and negligent conduct, to compensate for injuries, and to provide a fair distribution of risk. The law often imposes greater duties on persons in relationships with each other because the harm is more foreseeable. In every business or contractual relationship, parties will have duties imposed by law in addition to any duties they have assumed by agreement. It is possible that parties will assume greater duties by agreement than imposed by law, and it is possible that parties may alter duties imposed by law with respect to one another. However, where society has imposed a duty by law, that duty is not abrogated merely because parties also have a business or contractual relationship. It is ultimately for the legislature and this court to define duties imposed by law in this state. This court may, from time to time, decide whether a duty is cognizable in tort. Once having decided that a duty is cognizable in tort, it is for this court to decide if the tort duty should no longer apply to certain circumstances or events.

II
¶ 51 Second, the term "economic damages" in the independent duty context is linguistic sophistry. I agree with the lead opinion that it was a misnomer. See Rich Prods. Corp. v. Kemutec, Inc., 66 F.Supp.2d 937, 968 (E.D. Wis.1999, aff'd, 241 F.3d 915 (7th Cir.2001)); Miller v. U.S. Steel Corp., 902 F.2d 573, 574 (7th Cir.1990). The misnomer was unfortunate because any injury or damage that could be expressed in a dollar figure could also be thought to be an economic loss presumptively excludable under the doctrine. Alejandre v. Bull, 159 Wash.2d 674, 693, 153 P.3d 864 (2007) (Chambers, J., concurring). The words "economic loss rule" unfortunately gave the impression of a rule of general application; that anytime there is an economic loss, there would not be recovery in tort. But the terms "economic loss" and "economic damages" are much more expansive than the meaning encompassed by the term. For example, the Washington legislature declared that
"[e]conomic damages" means objectively verifiable monetary losses, including medical expenses, loss of earnings, burial costs, loss of use of property, cost of replacement or repair, cost of obtaining substitute domestic services, loss of employment, and loss of business or employment opportunities.
RCW 4.56.250(1)(a). Relevantly, Washington's product liability act (WPLA), chapter 7.72 RCW, defines "`Harm'" to "include[] any damage recognized by courts of this state: PROVIDED, That the term `harm' does not include direct or consequential economic loss under Title 62A RCW." RCW 7.72.010(6) (emphasis added). Searching judicial opinions for the meaning of economic loss will support the conclusion that all monetary damages are economic.[1] Unfortunately, *1272 the imprecise use of the term "economic loss rule" by this court led many to erroneously conclude that it was a rule of general application that precluded recovery in tort of virtually any harm that could be measured in dollars if a business relationship also existed between the parties.

III
¶ 52 Third, again, the independent duty doctrine is not a rule at all; rather it is an analytical tool used by courts to decide whether there is an independent duty cognizable in tort in the first instance. Whether or not we recognize a tort often involves policy considerations. See, e.g., Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984) (recognizing tort of wrongful discharge in violation of public policy); MacPherson v. Buick Motor Co., 217 N.Y. 382, 393, 111 N.E. 1050 (1916) (recognizing cause of action for products liability in the absence of privity of contract in light of the foreseeable risk of harm caused by defective automobiles). In large part, because of the growing acceptance of a cause of action for products liability without privity of contract, the independent duty doctrine was developed to assist courts in defining the boundaries between torts and contracts. Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wash.2d 816, 826, 881 P.2d 986 (1994). The doctrine provided a framework to consider multiple factors in that analysis. In determining whether or not to recognize a duty in tort, we have recognized policy considerations such as assessing risks of harm, reducing hazards, affixing responsibility, protecting the reasonable business expectations of product manufacturers and others engaged in business, and fostering the ability to insure against and apportion risk. Id. at 826-27, 881 P.2d 986. These and other interrelated factors are part of the independent duty analysis.
¶ 53 I agree with the lead opinion that an examination of how we got here is useful. However, I find it more useful to trace the independent duty rule from its inception to best understand its development. The lead opinion properly discusses the influential decision of East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), a case that never uses the words "economic loss doctrine" by name but is seminal to its development. The defendant, Delaval, had manufactured defective turbines that, once installed in the plaintiffs' boats, malfunctioned, causing significant loss of income. The plaintiffs sued in tort, based on a theory of products liability, among others. The defendants argued that the plaintiffs were limited to their contract damages. Under products liability law, the manufacturer is strictly liable "where a product `reasonably certain to place life and limb in peril,' distributed without reinspection, causes bodily injury." Id. at 866 (quoting MacPherson, 217 N.Y. at 389, 111 N.E. 1050). The court noted that we impose product liability in tort on the manufacturer "because `public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market.'" Id. (quoting Escola v. Coca Cola Bottling Co. of Fresno, 24 Cal.2d 453, 462, 150 P.2d 436 (1944) (Traynor, J., concurring)). "For similar reasons of safety, the manufacturer's duty of care was broadened to include protection against property damage." Id. at 867, 106 S.Ct. 2295. The question arose whether a products liability action could be brought when the product damaged was the product that had been purchased from the defendant. The court concluded that it could not because "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." Id. at 871, 106 S.Ct. 2295. The court characterized the plaintiffs' significant consequential damages as the "benefit of its bargain" and concluded that the law of warranty was better suited to redress plaintiffs' contractual disappointments. Id. at 868, 106 S.Ct. 2295. The East *1273 River court mentioned the phase "risk of harm" in discussing the policy of allowing parties to allocate risk among themselves. Since then, this court has discussed the risk of harm approach in determining liability for construction defects where the result of deterioration caused damage only to the defective product itself. See Wash. Water Power Co. v. Graybar Elec. Co., 112 Wash.2d 847, 860-65, 774 P.2d 1199 (1989); see also Alejandre, 159 Wash.2d at 684, 153 P.3d 864 (citing Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc., 119 Wash.2d 334, 351, 831 P.2d 724 (1992)).
¶ 54 The first time we discussed the independent duty doctrine, we found that a boat manufacturer who manufactured a defective fishing boat that caused no injuries when it broke down was answerable for the fishermen's lost profits. See Berg v. Gen. Motors Corp., 87 Wash.2d 584, 597, 555 P.2d 818 (1977). "The Berg decision was short-lived, however, as the Legislature effectively overruled Berg in 1981 with the enactment of the Washington product liability act (WPLA), RCW 7.72." Berschauer/Phillips, 124 Wash.2d at 822, 881 P.2d 986. We next examined the doctrine in the wake of the WPLA in Stuart v. Coldwell Banker Commercial Group, Inc., 109 Wash.2d 406, 745 P.2d 1284 (1987). In Stuart, we were asked to determine if there was a cognizable action in tort for negligent construction against contractors for deterioration to decks and walkways of a condominium complex. The condominium owners sued for negligent construction, breach of warranty, misrepresentation, and violations of the Consumer Protection Act (CPA), chapter 19.86 RCW. Id. at 410-11, 745 P.2d 1284. Most of the claims, including the warranty claims, were dismissed on summary judgment as time barred, leaving the issue before us whether negligent construction itself, outside the warranty context, was a cognizable tort cause of action in Washington. We examined the different policy goals served by tort and contract law. We noted that tort law is concerned with duties imposed by law rather than contract:
As a matter of public policy, it is appropriate that a duty be imposed on manufactures to produce products that will not unreasonably endanger the safety and health of the public, whether the ultimate impact of the danger is suffered by people, other property, or on the product itself. In contrast, contract law protects expectations interests, and provides an appropriate set of rules when an individual bargains for a product of particular quality or for a particular use.
Id. at 420, 745 P.2d 1284. In Stuart, although we discussed the public policy choice between tort and contract remedies as applying the doctrine, importantly, we did not suggest that the type of damages was a consideration. Instead we said that
the line between tort and contract must be drawn by analyzing interrelated factors such as [1] the nature of the defect, [2] the type of risk, and [3] the manner in which the injury arose. These factors bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law is most applicable to the claim in question.
Id. at 420-21, 745 P.2d 1284. Further, we cautioned that in applying the economic loss doctrine "the determinative factor should not be the items for which damages are sought, such as repair costs." Id. at 420, 745 P.2d 1284. We reasoned, if the plaintiffs were allowed to sue for negligent construction rather than only breach of contract, the builder-vendors in Washington would "become the guarantors of the complete satisfaction of future purchasers." Id. at 421, 745 P.2d 1284. We found this was troubling, among other things, because builders and buyers could not allocate the risk of faulty construction or meaningfully settle a dispute arising from a specific known defect. A subsequent purchaser, even knowing of the defect and benefiting from an initially low purchase price could buy a defective condominium at a reduced price and yet still sue the builder-vendor for negligent construction. Id. at 421-22, 745 P.2d 1284. We did not think that recognizing a tort remedy that would encompass such claims was necessary. Id. at 420, 745 P.2d 1284. We held that the owners could not recover in tort for deterioration to the decks themselves, and we grounded our decision *1274 on policy considerations. Id. at 421, 745 P.2d 1284.
¶ 55 Two years later, we were asked to consider the interplay of the WPLA and the doctrine. Graybar, 112 Wash.2d at 862-67, 774 P.2d 1199. Under the WPLA, a party suing for an injury caused by a product defect may recover "`any damages recognized by the courts of this state'" with the exception of "`direct or consequential economic loss.'" Id. at 851, 774 P.2d 1199 (quoting RCW 7.72.010(6)). Washington Water Power sued for damages resulting from defective insulators in federal court on a variety of theories,[2] seeking both direct and consequential economic damages, as well as personal injury and other property damages. Id. at 849, 774 P.2d 1199. The federal court certified to this court whether the WPLA preempted common law remedies and if so, whether the loss was compensable under the act. Id. at 848, 774 P.2d 1199. This court found that the WPLA did preempt common law remedies and that the WPLA provided the plaintiff no remedy because the only damages available were economic losses barred by the statute of limitations. We again rooted our analysis in public policy, and we again focused duties owed by the parties. Id. at 860-65, 774 P.2d 1199.[3] We found that the "risk of harm analysis appropriately accommodates the safety and risk-spreading policies that underlie the law of product liability, and `provides a workable and accurate distinction between accidents that should be actionable in tort and losses that should remain in the domain of warranty law.'" Id. at 865, 774 P.2d 1199 (quoting Lindley J. Brenza, Comment, Asbestos in Schools and the Economic Loss Doctrine, 54 U. Chi. L.Rev. 277, 300 (1987)). Under this analysis, in the products liability context, if the product was hazardous and caused harm, the defendant breached the duty of care and tort law applied. If the product merely disappointed the consumer in light of the contractual bargain, the defendant potentially breached a warranty, and the law of contracts applied. WPLA did not (and does not) define "economic loss." See RCW 7.72.010 (definition section). In that context, we said, "Generally speaking ... `economic loss' describes the diminution of product value that results from a product defect." Graybar, 112 Wash.2d at 856 n. 5, 774 P.2d 1199.
¶ 56 In Atherton Condominium Apartment-Owners Ass'n Board of Directors v. Blume Development Co., 115 Wash.2d 506, 534, 799 P.2d 250 (1990), we discussed the doctrine only briefly. Again, we rejected plaintiffs' negligent design claim against the architect of their condominium project because the specific defects complained of were not caused by the architect's work and because the plaintiffs cited no relevant authority that an architect had a tort duty to third party purchasers. Id. In a footnote, and without relevant analysis, the court also noted that the plaintiff owners had "fail[ed] to articulate a recognizable negligence claim [and] appear to seek only economic loss damages which are not recoverable under tort law." Id. at n. 17 (citing Architect and Engineer Liability: Claims Against Design Professionals § 7.9 (Robert F. Cushman & Thomas G. Bottum eds., 1987)).
¶ 57 In Berschauer/Phillips, 124 Wash.2d 816, 881 P.2d 986, we again decided a question of duty. We held as a matter of public policy that design professionals are not liable in tort to a general contractor for design defects that result in construction delays. Id. at 826, 881 P.2d 986. Although we relied upon the logic of our previous independent duty holdings that as a matter of public policy, in the construction industry parties could allocate risk among themselves in their contracts. Berschauer/Phillips differed from other cases in which we have discussed the independent duty doctrine because most of the parties had no contracts between or *1275 among themselves; thus, we were not saying the parties were limited to their contract remedies. We simply held, based upon public policy considerations, there was no duty of care owed by design professionals to general contractors. Id. at 826-28, 881 P.2d 986.
¶ 58 In Griffith v. Centex Real Estate Corp., 93 Wash.App. 202, 213, 969 P.2d 486 (1998), the Court of Appeals, applying the independent duty doctrine, held that a claim of negligent misrepresentation did not lie for a claim of defective cedar siding installation where the risks of water penetration of siding was specifically covered by the purchase and sale agreement and a one year limit for warranty claims for such defects was contained in the contract. Id. at 213, 969 P.2d 486.[4]
¶ 59 Similarly, in Alejandre, 159 Wash.2d 674, 153 P.3d 864, the plaintiff sued to recover damages arising from the purchase of a house. Id. at 677, 153 P.3d 864. The buyer claimed that the house was not as he believed because the septic system needed repair. Id. The sale of the house was controlled by a purchase and sale agreement that placed the burden on the buyer to perform an inspection; the sale was specifically conditioned upon the buyer's inspection of the septic system and "`[a]ll inspection(s) must be satisfactory to the Buyer, in the Buyer's sole discretion.'" Id. at 678, 153 P.3d 864 (quoting earnest money agreement) (alterations in Alejandre).[5] In Alejandre, the parties had, in essence, by agreement, modified the duty to disclose imposed by law. This court relied upon the independent duty doctrine as an analytical tool to support its conclusion that given the detailed contractual terms covering the sale of the house and the duties of the buyer to inspect, the seller did not have an independent duty to the buyer under the tort theory of negligent misrepresentation. Importantly, in Alejandre, we made no meaningful analysis of the nature of the damages and only said, "Here, the injury complained of is a failed septic system. Purely economic damages are at issue." Id. at 685, 153 P.3d 864. We cited Stuart, 109 Wash.2d at 420, 745 P.2d 1284, and Griffith, 93 Wash.App. at 213, 969 P.2d 486, for support of that statement that the claim was for purely economic damages. See Alejandre, 159 Wash.2d at 684-85, 153 P.3d 864.
¶ 60 In sum, a careful examination of our case law reveals that this court has applied the independent duty rule to limit tort remedies in the context of product liability where the damage is to the product sold and in the contexts of construction on real property and real property sales. We have done so in each case based upon policy considerations unique to those industries. We have never applied the doctrine as a rule of general application outside of these limited circumstances.

IV
¶ 61 To summarize, duties imposed by law and duties assumed by agreement often apply to the same events. It is the province of this court to decide the duties imposed by law and once having recognized a tort duty, it is the province of this court to decide that a duty no longer applies to certain circumstances or events. Cf. United States v. Booker, 375 F.3d 508, 513 (7th Cir.2004) (citing State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997)). The independent duty doctrine has been an analytical tool used by the court to maintain the boundary between torts and contract. It is an analytical tool to apply policy considerations to determine if a tort should be recognized in the first instance. I agree with the lead opinion that the analysis involves "considerations of common sense, justice, policy, and precedent." Lead opinion at 1262. I *1276 agree with the lead opinion that there is a duty in tort not to commit waste. It is a duty imposed by common law and codified in RCW 64.12.020. The duty not to commit waste is and always has been independent of and in addition to any duties assumed by contractual lease covenants. This court has never held otherwise. If our jurisprudence has recognized a tort in the past, lower courts should recognize those torts unless and until this court has, based upon considerations of common sense, justice, policy and precedent, decided otherwise. It is my reading of the lead opinion that the role of the trial court is to determine if the duty sought to be enforced is one essentially assumed by agreement or imposed by law. If it is a duty solely assumed by agreement, contract remedies apply, and if it is a duty based upon a standard of care imposed by established law, unless clearly waived or modified by agreement, tort remedies apply. I agree that is the appropriate role of the trial court.
¶ 62 I do not find the lead opinion's discussion of proximate cause particularly enlightening. Lead opinion at 1264-65, 1267. It is enough to say that the legislature and the court define the existence of a duty as a matter of law. The issue of the scope of the duty is complex and largely controlled by foreseeability.
¶ 63 I agree with and commend the lead opinion's conclusion that the term independent duty rule is a more appropriate term than economic loss rule to describe the doctrine. Id. at 1264-65. I disagree with Chief Justice Madsen's attempt to define "economic losses" in her concurrence. Those losses we have excluded by application of what we called the economic loss rule we have called economic losses, and we have excluded economic losses by application of what we called the economic loss rule. It is perversely circular to begin the analysis with the end result.
¶ 64 Finally, I agree with the lead opinion that Maurice Warren, an employee of Horse Harbor, may be liable for tortious conduct, that the Dalings are not shielded by RCW 4.24.264(1) and are liable for their gross negligence in permitting waste, and Linda Eastwood is entitled to an award of reasonable attorney fees.
¶ 65 With these observations, I concur with the lead opinion.
WE CONCUR: CHARLES W. JOHNSON, RICHARD B. SANDERS and DEBRA L. STEPHENS, Justices.
NOTES
[1] Horse Harbor did not appear before us. But Warren and the Dalings did, arguing in favor of affirming the Court of Appeals.
[2] This is the same affirmative duty to disclose material facts, of which the seller has knowledge, that would have been the basis for the Alejandres' fraud claim in Alejandre had they offered enough evidence. This is a slightly different, though potentially overlapping, duty from the duty of ordinary care that can be the basis for a negligent misrepresentation claim.
[3] Of course, we do not disturb "[t]he general rule... that a party to a contract can limit liability for damages resulting from negligence." Am. Nursery Prods., Inc. v. Indian Wells Orchards, 115 Wash.2d 217, 230, 797 P.2d 477 (1990). "Exculpatory clauses are strictly construed and must be clear if the exemption from liability is to be enforced." Scott v. Pac. W. Mountain Resort, 119 Wash.2d 484, 490, 834 P.2d 6 (1992). An "inconspicuous" exculpatory clause is unenforceable. Id. at 492, 834 P.2d 6.
[4] Conceiving of harm as potentially both an economic loss resulting from a contract breach and an injury resulting from a tort is akin to concluding, for example, that a citizen's injury is the result of the government's breaching both a statutory obligation and a constitutional provision. When a court says, "the economic loss rule applies," the court is simply articulating a conclusion that, in a particular set of circumstances, the law of contracts is the only source of a defendant's obligations and no tort duty exists.
[5] The concurrence written by Chief Justice Madsen posits that our analysis to this point is unnecessary and that we need not say more than: "the economic loss doctrine cannot be applied to bar a statutory cause of action." Concurrence (Madsen, C.J.) at 1269. The Madsen concurrence is correct that we cannot use a common law doctrine to abolish a statutory cause of action. But this view accounts for only half of the equation in this case. RCW 64.12.020, by its terms, gives a remedy for waste, not other sorts of injuries. Thus, when a plaintiff brings an action under RCW 64.12.020, an issue is whether the plaintiff's injury is waste within the meaning of the statute. Eastwood claims her damages are for waste, whereas Warren and the Dalings, following the Court of Appeals' analysis, insist that Eastwood's injury is merely an economic loss in the sense that she lost the benefit of a contractual bargain. As in all cases involving the economic loss rule, we cannot resolve these competing claims without looking to the legal duties breached by Horse Harbor, Warren, and the Dalings. Further, RCW 64.12.020 simply provides a right of action for an aggrieved plaintiff. The plaintiff's substantive right, however, is one defined at common law.
[6] Neither side contends that the Dalings' actions or omissions were not a "decision or failure to decide" within the meaning of the statute, and so we accept that their actions and omissions fall within the scope of the statute.
[7] Because the Dalings' liability flows from their gross negligence in permitting waste, a tort, we do not reach the issue of whether a nonprofit corporate director could ever be individually liable for the corporation's breach of contract.
[1] As the court explained in Alejandre, "[t]he key inquiry is the nature of the loss and the manner in which it occurs, i.e., are the losses economic losses, with economic losses distinguished from personal injury or injury to other property. If the claimed loss is an economic loss, and no exception applies to the economic loss rule, then the parties will be limited to contractual remedies." Alejandre, 159 Wash.2d at 684, 153 P.3d 864. As mentioned, the property itself was not property that was purchased and turned out to be defective, nor did it cause personal injury or injury to other property.

The lead opinion misrepresents my analysis to conclude that it favors a determination that the injury to property here is an economic loss. Lead opinion at 1266. A comparison of what I actually say, in full, and what the lead opinion thinks I should have said shows that this is not the case and that the economic loss rule set forth in our prior cases is not as difficult to apply under these facts as the lead opinion portrays.
[1] In a workers' compensation case, economic damages included lost wages and medical expenses. Cruz v. Montanez, 294 Conn. 357, 371-72, 984 A.2d 705 (2009). In a business tort, "economic damages" included loss of a $500,000 investment. Nutragenetics, LLC v. Superior Court, 179 Cal.App.4th 243, 247, 101 Cal.Rptr.3d 657 (2009). In a construction defect case where a masonry wall collapsed, economic damages included the cost of replacement and repair of the wall. Viking Constr. Mgmt., Inc. v. Liberty Mut. Ins. Co., 358 Ill.App.3d 34, 56, 294 Ill.Dec. 478, 831 N.E.2d 1 (2005). In a class action suit seeking reimbursement for excessive prices on synthetic thyroid medications, "economic damages" included the difference between what the drugs should have cost and what they did cost. BASF AG v. Great Am. Assur. Co., 522 F.3d 813, 817 (7th Cir.2008). In an insurance bad faith case, the court described as "economic damages" that the insured was claiming included: underpaying and delaying payment of legal fees and costs, reneging on agreements regarding the allocation of defense costs and a reasonable hourly fee rate, and refusing to contribute an adequate settlement, all of which exceeded $1,000,000. Compulink Mgmt. Ctr., Inc. v. St. Paul Fire & Marine Ins. Co., 169 Cal.App.4th 289, 293, 87 Cal.Rptr.3d 72 (2008).
[2] Graybar sued for breach of contract and warranty, as well as under the federal racketeer influenced and corrupt organizations act, 18 U.S.C. § 1964, WPLA, and the CPA, and for negligence, strict liability, fraud, negligent misrepresentation, and estoppel. Graybar, 112 Wash.2d at 849-50, 774 P.2d 1199.
[3] "Like the common law actions they displaced, the causes of action authorized by the WPLA place liability for injuries resulting from hazardous product defects on the manufacturers and distributors who are best positioned to avoid those injuries." Graybar, 112 Wash.2d at 864, 774 P.2d 1199.
[4] The Court of Appeals also held there were genuine and material facts as to whether Centex engaged in unfair or deceptive acts and reversed the trial court's dismissal of plaintiffs' class action CPA claims. Griffith, 93 Wash.App. at 217-18, 969 P.2d 486.
[5] The seller disclosed that a few years before the pipe between the house and the septic tank had been replaced. Alejandre, 159 Wash.2d at 679, 153 P.3d 864. The buyer had the septic tank pumped and inspected; the inspector stated that the "back baffle could not be inspected but there was `[n]o obvious malfunction of the system at the time of work done.'" Id. (citing record) (alterations in Alejandre). Had the back baffle been inspected, the defect likely would have been discovered. Id. at 690, 153 P.3d 864.