IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JAMES WALTZ, | ) | |
| MARILYN MILLER, | ) | No. 31582-7-III |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | OPINION PUBLISHED |
| TANAGER ESTATES HOMEOWNER'S | ) | IN PART |
| ASSOCIATION, | ) | |
| | ) | |
| Respondents. | ) | |

KORSMO, J. — This dispute between homeowners and their homeowners

association was tried to the bench. As often happens when neither side abides by the

rules of the game, the referee faced a difficult problem determining who fouled whom

and which fouls deserved to be called.[1] Because the court applied the wrong standard of

care to the actions of the board of directors of a nonprofit corporation in an action

brought by members of the corporation, we reverse and remand for a new trial.

We discuss that issue in the published portion of this opinion. In the unpublished

portion, we address the facts of the case and conclude that the trial court (1) correctly

denied the request for a jury trial, (2) erred in applying equitable estoppel, and

(3) correctly rejected the other claims for relief.

---

[1] "In sporting parlance, 'No harm, no foul.'" *State v. Momah*, 167 Wn.2d 140,
156, 217 P.3d 321 (2009) (Penoyar, J.P.T., concurring).

The dispute began when appellants James Waltz and Marilyn Miller (Waltzes) began remodeling their home in Tanager Estates, a planned unit development located in Mead. Tanager Estates is subject to a declaration of covenants, conditions, and restrictions (CC&Rs) that are enforced by the Tanager Estates Homeowner's Association (HOA). The HOA is a nonprofit organization organized under 24.03 RCW. It is governed by a Board of Directors (Board). All property owners are members of the HOA. Ex. 1, Article V.

After the events discussed later, the Waltzes sued the HOA and the individual members of the Board concerning the process by which initial remodeling plans were rejected and one unsatisfactory to the Waltzes was eventually approved. At a bench trial, the court found that the directors were not grossly negligent in the performance of their duties and thus did not breach their fiduciary duties to the Waltzes. The court entered its own extensive findings of fact and conclusions of law. The Waltzes timely appealed to this court from the judgment in favor of the defendants.

*Standard of Care*

The Waltzes argue that the trial court applied the wrong standard of care to the actions of the Board president, Mr. Kirk Firestone, and the other directors when it determined that they did not breach their fiduciary duties. The court did apply an incorrect standard in determining whether they should be individually liable for their actions. We therefore reverse the judgment as to the directors.

2

The HOA is organized under chapter 24.03 RCW, the Washington Nonprofit Corporation Act. This act applies only to corporations organized under the provisions of the chapter. RCW 24.03.010(1). The chapter imposes upon directors an obligation to act "in good faith" and "with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." RCW 24.03.127.

Chapter 24.06 RCW is the Nonprofit Miscellaneous and Mutual Corporations Act. By its terms, the chapter also applies only to organizations formed under its auspices. RCW 24.06.010(1).[2] The chapter provides that board members and directors "shall have the same immunity from liability as is granted in RCW 4.24.264." RCW 24.06.035(1). The chapter also provides that directors and officers are not individually liable to the corporation, its shareholders[3], or its members. RCW 24.06.035(2). The immunity applies "except for acts or omissions that involve intentional misconduct or a knowing violation of the law, or that involve a transaction from which the director or officer will personally receive a benefit in money, property, or services to which the director or officer is not legally entitled." *Id.*

In turn, RCW 4.24.264 states:

(1) Except as provided in subsection (2) of this section, a member of the board of directors or an officer of any nonprofit corporation is not

---

[2] It also applied to certain corporations formed under titles that were repealed when RCW 24.03 was enacted in 1969. *See* RCW 24.06.010(2); RCW 24.03.920.

[3] One of the significant differences between RCW 24.03 and RCW 24.06 is that stock may not be issued by a chapter 24.03 corporation. *See* RCW 24.03.030(1).

individually liable for any discretionary decision or failure to make a discretionary decision within his or her official capacity as director or officer unless the decision or failure to decide constitutes gross negligence.

(2) Nothing in this section shall limit or modify in any manner the duties or liabilities of a director or officer of a corporation to the corporation or the corporation's members.

This immunity statute applies to nonprofit corporations organized under RCW 24.03.

*Eastwood v. Horse Harbor Found.*, 170 Wn.2d 380, 241 P.3d 1256 (2010).

The trial court entered Conclusion of Law 5 addressing the standard of care

governing the directors. It states:

The Board members did not breach their fiduciary duty and are not individually liable for the alleged damages. Although Mr. Firestone's actions significantly pressed the boundaries of authority, the evidence is insufficient to establish knowing bad faith wrongful conduct in carrying out duties (Annechino v. Worthy) [sic] intentional misconduct, a knowing violation of the law, receipt of an improper personal benefit, or grossly negligent decision making pursuant to RCW 24.06.035(2) and RCW 4.24.264.

Clerk's Papers at 829 (CP).

Appellants challenge[4] this conclusion, correctly noting that RCW 24.06.035(2)

does not apply because the HOA was organized under RCW 24.03 rather than

---

[4] Appellants also argue that Mr. Firestone's actions more than "pressed the boundaries" of his authority. We agree with appellants that, in fact, Mr. Firestone exceeded his authority. For instance, he appointed Mr. Murray as replacement vice president even though only the Board could do so. Ex. 3 (Bylaws Section VIII). Similarly, his action in unilaterally transferring the Waltz project to the Board from the Architectural Committee was a matter left to the Board rather than to an individual member. Ex. 3 (Bylaws Sections VI, VII).

RCW 24.06. While we agree that the trial court erred in mentioning this statute, that mistake is of no consequence because both chapters are governed by the immunity provision, RCW 4.24.264, that the court did apply.

RCW 24.06.035(1) expressly indicates that RCW 4.24.264 is applicable to that chapter. There is no similar express adoption of the immunity provision by chapter 24.03 RCW, but there also appears to be no need to do so since the statute applies to the directors of "any nonprofit corporation." RCW 4.24.264(1). A majority of the Washington Supreme Court likewise confirmed that the provision applies to RCW 24.03 corporations. *See, Eastwood*, 170 Wn.2d at 400-01 (lead opinion of J. Fairhurst), 418 (concurring opinion of J. Chambers).[5]

The Waltzes argue that because RCW 24.03.127 imposes a negligence standard on corporate directors and officers, the second paragraph of the immunity statute (shall not "limit . . . the liabilities of a director . . . to . . . the corporation's members") preserves that negligence standard as to them. We agree that RCW 4.24.264 effectively creates an immunity that only applies against non-members of a nonprofit corporation.

In *Eastwood*, the plaintiff (a landlord) sued a nonprofit corporation and two of its corporate directors for the tort of waste, along with other causes of action. 170 Wn.2d at 383-84. The trial court found the directors grossly negligent and thus individually liable

---

[5] The concurring opinion of Chief Justice Madsen did not address the statute. *Eastwood*, 170 Wn.2d at 402-06.

5

for waste. *Id.* at 384. On appeal, the court affirmed the determination that the directors were individually liable to the landlord due to their gross negligence over an objection that the directors were immune altogether. *Id.* at 400-01 (lead opinion of J. Fairhurst), 418 (concurring opinion of J. Chambers).

The trial court here, as in *Eastwood,* applied a gross negligence standard to the actions of the board members, although the result, unlike *Eastwood,* was to find the directors not liable. In light of RCW 4.24.264(2), it was error to apply the stricter standard of gross negligence to the directors for their dealings with members of the corporation. As we read the statute, RCW 4.24.264(1) sets a gross negligence standard for liability of directors in the course of their official actions, while subsection (2) preserves any different statutory standard that might apply between directors and the corporation or its members. In the case of nonprofits organized under RCW 24.03, RCW 24.03.127 sets forth a reasonableness standard for directors in their dealings with the corporation and its members.

This view also finds support in the scant legislative history materials addressing the provision. The House Bill Report summarizes the provision in this manner:

> IMMUNITY FOR DIRECTORS OF NONPROFIT CORPORATIONS exists for a member of the board of directors or an officer from civil liability . . . unless the act or omission constitutes gross negligence or violates a duty owed to the corporation or shareholders of the corporation.

H.B. REP. on Substitute S.B. 6048, at 3, 50th Leg., Reg. Sess. (Wash. 1987). This view confirms that the directors of an RCW 24.03 corporation have two standards governing

their liability—they are only liable in instances of gross negligence unless they violate a duty owed the corporation or its members. It is understandable that the legislature chose to maintain a higher standard of care to those with whom the directors have a fiduciary relationship.

Since the directors owed the Waltzes, as members of the corporation, the obligation to act in good faith with the care of an ordinarily prudent person, they could be liable to them for negligent actions. The trial court erred in applying the higher standard of gross negligence. Thus, a new trial is needed at which the appropriate standard is applied.

Reversed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

## FACTS

There are subcommittees of the HOA, including the Architectural Committee (AC). The AC is in charge of approving or denying proposed changes or additions to existing homes. At the times in question here, Board Vice President Gary Wilson chaired the AC.

The Waltzes began building a storage shed without permission of the AC. Mr. Wilson alerted them to the requirement that they must obtain AC permission prior to building, and provided a copy of the CC&Rs to the Waltzes. Mr. Waltz then submitted

7

plans to construct a storage shed, shop, and a garage addition for a third car that depicted a single story garage with a "hip roof" over the third bay. The AC approved those plans in 2007.

In June 2008, the Waltzes began work on the garage addition, and around July 1, 2008, the walls for the new garage addition were up. It was at this time that members of the AC became aware and concerned that the garage addition Mr. Waltz was building was not what had been approved in 2007. Instead, Mr. Waltz had decided to increase the height of the garage to include a full second story "bonus room."

On July 1, 2008, Mr. Wilson stopped by the Waltz residence and dropped off a copy of the 2007 plan and on it he wrote:

> Over single story County guideline's is 10' from property line
> Current structure is not approved by TEHA Arch. Committee
> Please call Gary Wilson . . .

Finding of Fact (FF) 26; CP at 823.

The next day Mr. Wilson contacted Spokane County and learned that the Waltzes' proposed construction plans complied with the County's setback requirements. Later that day Wilson advised the Waltzes that they needed to submit revised plans to the AC, but that he thought the County's approval would override the CC&Rs. That latter piece of advice turned out to be incorrect since Article 8.1 of the CC&Rs provided that its stricter controls would govern.

The Waltzes resumed construction of the garage based on these assurances and submitted a revised plan to the AC on July 6. The plan depicted a garage with a full second story. Work proceeded until July 13 when Kirk Firestone, Board President, presented the Waltzes a stop-work order issued by the "Executive Board." The AC had not yet acted on the July 6 plan. The garage addition lacked a roof or siding, leaving it exposed to the elements while the stop-work order was in effect.

The AC formally denied the July 6 plan sometime between July 11 and July 14, 2008. On their individual written votes the AC indicated that the project was denied because the garage was too tall and was "not harmonious" with the other homes in the HOA. Ex. 10. A formal denial was given to the Waltzes on July 15, 2008, with suggestions for remedies which included reducing the height of the garage. Ex. 10.

Mr. Waltz then submitted another plan on July 17, 2008, depicting much the same design but added the dimensions of the garage and also included the full front of the home in the drawing. Ex. 11. This plan was also denied by the AC on July 20, 2008. The reasons for the denial again included that the design was too tall, not harmonious, and overwhelming. Ex. 11. In the formal denial, the AC again suggested reducing the wall height for the structure above the garage. Ex. 11; FF 33.

When Mr. Wilson delivered the denial for the July 17, 2008 plan, he brought with him a piece of paper with four designs he had drawn up as possible suggestions for what might be approved by the AC. Mr. Wilson asked Mr. Waltz to circle which design Mr.

Waltz preferred. Mr. Waltz circled a plan depicting the height of the garage at 24' 6" which was in excess of the 24' house measurement. Ex. 20.

Before the committee had voted on that plan, Mr. Wilson forwarded an e-mail to the AC with another plan lowering the height on the addition to 24'. This e-mail was circulated on July 28, 2008. The next day Mr. Wilson forwarded still another e-mail for a "revised submittal with corrected measurements." Ex. 13. That drawing was signed by Mr. Waltz. The drawing showed a measurement for the front of the house at 25' and a measurement for the addition at 25' 7". Ex 13. The same day, Mr. Wilson forwarded yet another e-mail with an additional schematic for the trusses and different measurements.

Two members of the AC sent e-mails expressing confusion. Ms. Marcia Ethridge asserted that the proposed designs continued to be too tall, and that she was confused on which of the several recently submitted plans the AC was voting on. FF 38; Exs. 3-6. Ms. Marie Firestone requested a meeting, expressing similar confusion. FF 39; Exs. 3-6.

Mr. Wilson responded to the two e-mails indicating that he intended to proceed with an e-mail vote rather than holding a meeting; anyone who felt the plan lacked information could vote against the plan. Mr. Firestone, as president of the Board, sent an e-mail stating:

> All current votes are null and void as the AC has not been provided a complete set of plans to evaluate. An AC member has requested a meeting. As you are not willing to schedule one, I will. You will not send out a denial or approval on this plan. I will be contacting the AC and Mr. Waltz.

FF 41; Ex. 33.

10

Mr. Wilson responded by sending the Board and the AC an e-mail in which he resigned as chair of the AC and as vice president of the Board. He also advised the recipients that the Waltzes' project would have been approved by a five to three margin if Mr. Firestone had not voided the voting.

Mr. Firestone met with Mr. Waltz on July 31, informed them of Wilson's resignation, and requested that they submit a new plan with views and measurements of all sides. The next day Mr. Firestone asked William Murray to assume Wilson's positions of Board vice president and AC chair. There was no Board meeting to make these selections.

The Waltzes submitted a plan to Firestone on August 2. It depicted a proposed height of 25' 3" for the addition and 24' 7" for the house. The AC met the next day, but no minutes were reported and there was conflicting testimony about what happened at the meeting. However, the AC did turn the Waltz matter over to the Board. On August 4, Mr. Firestone notified the Waltzes that the August 2 proposal had been rejected and explained modifications that would be necessary. The Waltzes submitted a revised plan under protest that lowered the garage to 23' 8". The Board approved this plan and construction resumed. The project was completed in September.

The Waltzes commenced suit in May 2011, filing against the HOA and most individual members of the Board, alleging violation of fiduciary duties. The complaint sought a declaratory judgment and monetary relief. The Waltzes also filed a jury demand.

The defendants moved to strike the jury demand, arguing that the relief sought was primarily equitable in nature. The court agreed and struck the jury. The case proceeded to a bench trial. At the conclusion of trial, the parties submitted written argument and proposed findings of fact and conclusions of law. The plaintiff's theory of the case was that Firestone's actions, ratified by the Board, in improperly preventing voting on the late July plans and in falsely saying that the August 2 plan had been denied, entitled them to damages and to rebuild the addition the way they wanted. The trial court entered its own extensive findings and judgment in favor of the defendants after determining that the board members did not violate their fiduciary duties and that equitable estoppel also barred the claims.

The Waltzes timely appealed to this court.

## ANALYSIS

This appeal raises several issues, although not all of them need be addressed in light of our disposition. The Waltzes claim that the trial court erred in striking their jury demand, in applying equitable estoppel, and in denying them the opportunity to rebuild as they desire. They also argue that some of the court's findings and conclusions are in error; we will discuss those contentions in conjunction with the associated issues. We otherwise address the arguments in the order listed.

*Jury Demand*

The Waltzes contend that the trial court erred in striking their jury demand. The trial court did not abuse its discretion.

A trial court has "wide discretion" in determining whether a case is primarily equitable in nature; therefore, the abuse of discretion standard applies to review of this issue. *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 368, 617 P.2d 704 (1980). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

There is a right to jury trial when a civil action is "purely legal in nature." *In re Estates of Foster*, 165 Wn. App. 33, 46, 268 P.3d 945 (2011). However, there is no right to a jury trial when an action is "purely equitable in nature." *Id.* A claim for money damages does not alone make an action legal in nature. *Id.*

Washington courts look to whether a claim was within the exclusive jurisdiction of equity courts at the time our constitution was adopted in 1889 in order to determine if it is equitable in nature. *Auburn Mech., Inc. v. Lydig Constr., Inc.*, 89 Wn. App. 893, 897-98, 951 P.2d 311 (1998). If, however, an action is neither purely equitable nor purely legal, our courts consider whether it is primarily one or the other. *Id.* at 898. Doubts are resolved in favor of the jury trial right. *Id.* Characterization of the claims as either legal or equitable is the initial step in the analysis. *Id.*

13

Here the Waltzes sought a declaration that (a) they were entitled "to construct the new addition consistent with the revised plan approved by a majority of the Architectural Committee or as approved by lack of action by the Architectural Committee; (b) the Architectural Committee's failure to act on the revised plans as submitted constitutes approval of those revised plans under the CC&Rs; and (c) that the actions of the Board Members and the Association to impose new architectural guidelines and to override the authority of the Architectural Committee were ultra vires and invalid." They also sought general and special damages "in an amount to be proven at the time of trial, but no less than $25,000." CP at 19.

The remedies requested here are primarily equitable in nature. For instance, the interpretation of the CC&Rs and bylaws, which is required to resolve the claims at issue here, is a matter assigned to a judge rather than a jury. *E.g., Day v. Santorsola,* 118 Wn. App. 746, 756, 76 P.3d 1190 (2003). Similarly, whether a fiduciary duty is owed is a question of law for a judge to decide, although whether the duty was breached is a question of fact for a jury. *Lodis v. Corbis Holdings, Inc.,* 172 Wn. App. 835, 857, 292 P.3d 779 (2013). In essence, the Waltzes sought to rescind the approval of the plan they did not want and to substitute their preferred plan without further interference from the HOA—remedies of rescission, declaratory judgment, and (arguably) injunctive-type relief against the HOA. These are all equitable remedies.

14

The decision in *Brown* bears many similarities to this one. There the defendant had closed its grocery store, sublet the premises to another store, and opened a competing store in the vicinity. *Brown*, 94 Wn.2d 359. The landlord sought a declaration that the defendant had abandoned the lease, requested surrender of the premises, restoration of the premises to original condition at tenant's expense, and recovery for damages suffered by the landlord, including loss of business. *Id.* at 365-66. The court noted that although there were both legal and factual issues for trial, the nature of the relief sought was "almost exclusively equitable in nature." *Id.* at 366. The court affirmed the trial court's decision to strike the jury trial request. *Id.* at 368.

Similarly here, we think the requested remedies predominately are equitable in nature and the case is so bound up in the construction of the CC&Rs that this was essentially an equitable action. Accordingly, the trial court had very tenable grounds for striking the jury demand. There was no abuse of discretion.

*Equitable Estoppel*

The Waltzes contend that the trial court erred in finding that equitable estoppel applied to this action. Because some of the court's unchallenged findings are inconsistent with equitable relief, we agree and reverse the judgment.

Conclusion of Law 6 states that the claim is barred by equitable estoppel. As rightly noted by the trial court in that conclusion:

> Estoppel prevents a party from asserting a claim or right that contradicts
> what the party has said or done before. The elements of estoppel are: (1)

15

> an admission, statement, or act inconsistent with the claim afterwards
> asserted, (2) action by the other party on the faith of such admission,
> statement, or act, and (3) injury to such party resulting from allowing the
> first party to contradict or repudiate such admission, statement or act.

CP at 829-30. *Accord, Lybbert v. Grant County*, 141 Wn.2d 29, 35, 1 P.3d 1124 (2000).

"A party ratifies an otherwise voidable contract if, after discovering facts that warrant rescission, she remains silent or continues to accept the contract's benefits. A ratifying party must have acted voluntarily and with full knowledge of the facts." *Snohomish County v. Hawkins*, 121 Wn. App. 505, 89 P.3d 713 (2004). The trial court entered Conclusion of Law 7 which appears to state a theory of ratification:

> Clear, cogent and convincing evidence established that Waltz submitted his
> final building plan to the Board for approval on August 4, 2008. It was
> voted on and approved by the Board, and Waltz then signed every page of
> the approved plans. Subsequently, he built the addition in accordance with
> those plans. Waltz acquiesced to the Board's authority to oversee the
> building approval process by submitting, signing off on, and building in
> accordance with the final approved plans.

CP at 830.

Several of the trial court's factual findings bear upon the legal issues presented by Conclusion 6 and, presumably, Conclusion 7. In Finding of Fact 41, the court found that Kirk Firestone, acting as President of the Board, sent an e-mail declaring the AC votes "null and void" and indicating that he would be calling a meeting of the AC. CP at 827. Finding of Fact 43 indicates that there were no written votes by the AC on the later July submissions concerning the Waltz property. CP at 827. Finding of Fact 44 indicates that Firestone told Waltz that Wilson had resigned and that Waltz should submit a new plan to

16

Firestone. Finding of Fact 45 indicates that Mr. Firestone, not the Board, appointed William Murray as vice president. CP at 827. Finding of Fact 48 indicates that the AC met on August 3, turned the Waltz matter over to the Board, and took no action on the August 2 Waltz proposal. CP at 828. Finding of Fact 49 states that Firestone then told Waltz that the August 2 proposal had been rejected. CP at 828. "Despite strong disagreement, Mr. Waltz provided another set of plans. . . ." FF 50; CP at 828.

Finding of Fact 51 relates that Firestone scheduled an emergency Board meeting to deal with the Waltz situation on August 5. But, Firestone's "credibility was significantly diminished through evidence of two sets of differing minutes regarding the transfer of the issue from the Architectural Committee. However, the evidence is sufficient to establish the fact that the Board approved the plan submitted by Mr. Waltz on August 4, 2008." CP at 828. Finding of Fact 53 states that Waltz "testified that he objected, signed, and built 'under protest,' but no written notation to that effect was provided." CP at 828.

We have stated these findings at some length because they bear on our resolution of the two conclusions. First, it has long been the rule in this state that equity does not aid those with unclean hands. *E.g., Mutual of Enumclaw v. Cox*, 110 Wn.2d 643, 650-51, 757 P.2d 499 (1988). Only innocent parties can invoke the doctrine. *Id.* at 651. That principle has play here. The essence of the argument by the Waltzes is that Firestone induced the August 4 plan by lying about the August 2 plan when he told them it had not

17

been approved, although he knew that no action had been taken on the proposal. FF 48, 49. For Firestone and the HOA to rely upon the purported substitution of the August 4 plan for the August 2 plan as a basis for equitable relief is simply untenable under these uncontested factual findings. *Id.*

Second, and more fundamentally, the defendants did not establish the elements of equitable estoppel. They presented no evidence, and the court made no findings, in support of elements two and three—reliance and injury. We see no evidence that the HOA relied upon the Waltzes withdrawing the August 2 plan in favor of the August 4 proposal or that the HOA was somehow injured by that process. It simply has not established these elements of equitable estoppel.

Third, it is unclear whether the trial court also applied the doctrine of ratification to supplement its collateral estoppel ruling. Respondents relied upon a defense of equitable estoppel, primarily arguing this court's decision in *Ebel v. Fairwood Park* II *Homeowners' Association*, 136 Wn. App. 787, 150 P.3d 1163 (2007). However, *Ebel* involved the contract doctrine of ratification, as do the cases it relies upon. In *Ebel*, members of a homeowner's association attempted to void the association on the basis that the CC&Rs at issue there did not create one. This court, affirming the trial court, determined that the members of the association had actively participated in the group and therefore ratified its existence. *Id.* at 793-94.

*Ebel* in turn relied upon *Hawkins*. *See Ebel*, 136 Wn. App. at 794. *Hawkins* involved ratification of a deed by silently accepting the benefits of an otherwise voidable contract with knowledge of the deficiencies. 121 Wn. App. at 510-11. Each of the cases relied upon in *Hawkins* similarly involved parties knowingly ratifying voidable or fraudulent contracts. *Wilson v. Pearce*, 57 Wn.2d 44, 355 P.2d 154 (1960); *Power v. Esarey*, 37 Wn.2d 407, 224 P.2d 323 (1950); *Ward v. Richards & Rossano, Inc.*, 51 Wn. App. 423, 433, 754 P.2d 120 (1988).

If ratification applies to a tort action, it does not apply under the facts of this case. The Waltzes were not accepting the benefit of a contract that they knew was voidable, but simply acting to mitigate their damages once they had been falsely told that their previous plan had been rejected. They had no actual knowledge of any deficiencies that they could ratify. Ratification is not applicable here.

Moreover, even if it could possibly apply, the doctrine of unclean hands would preclude Mr. Firestone and the HOA from relying upon it. They induced the Waltzes to offer the final plan under false pretenses and cannot now take advantage of that action.

In sum, the doctrines of equitable estoppel and ratification were not established in this case, and the doctrine of unclean hands would otherwise bar defendants from asserting those defenses. The trial court erred in concluding otherwise. For this reason, also, we reverse and remand for a new trial.

19

No. 31582-7-III
*Waltz & Miller v. Homeowner's Ass'n.*

*Committee Failure to Act*

The Waltzes also contend that the trial court erred in rejecting their claim that the AC's failure to act upon their plans resulted in the plans becoming approved by operation of the by-laws.[6] The trial court correctly rejected this claim.

Article 9.1 of the CC&Rs states in full (with emphasis supplied):

9.1 Approval of Plans by Architectural Committee. **No building, fence, wall or other structure shall be commenced,** erected or maintained upon the Project, **nor shall, any** exterior addition to or **change or alteration therein be made until the plans** and specifications showing the nature, kind, shape, height, materials, and location of the same **shall have been submitted to and approved in writing** as to quality of workmanship and materials, and harmony of external design and location in relation to surrounding structures and topography by an architectural committee composed of three (3) or more representatives appointed by the Board of Directors of the Association. **In the event said committee fails to approve or disapprove such design and location within thirty (30) days after said plans and specifications have been submitted to it or if no suit to enjoin the erection of such structures has been commenced prior to the completion thereof, approval will not be required and this Article will be deemed to have been fully complied with.**

The Waltzes' argument regarding a default approval is a technical one. They argue that they[7] submitted plans on July 29, 2008 and August 2, 2008, that were not acted

---

[6] The Waltzes also seek attorney fees for violations of chapter 64.38 RCW, the Homeowners' Association Act. At this point they have not yet established any violations of the Act and we, like the trial court, therefore decline to award fees under it. We also question whether fees could be awarded under the Act when it was not pleaded, but we likewise do not reach that issue.

[7] As Mr. Wilson, not the Waltzes, submitted the July 29 plan, it seems a stretch for appellants to claim that plan as their own, even if Mr. Waltz did initial it. However, the respondents do not contest the claim and we will not.

20

upon by the AC. FF 37, 46; CP at 825, 827. Therefore, they now claim authority under the final sentence of Article 9.1 (highlighted above) to build in compliance with their earlier proposals. For several reasons, we agree with the trial court that the argument is unavailing.

First, we note that the court found that the Waltz matter was transferred to the Board on August 3. Thus, the AC had no authority to act on the matter and nothing was pending before the AC for a 30-day period. By its express terms, Article 9.1 only applies to the AC. We doubt that under the plain language of the article there was any basis for deeming the proposals approved where they did not linger in that committee.

Second, the highlighted first sentence of the article reiterates that the Waltzes could not commence building, nor modify their original building plan, without first submitting their written proposal to the AC. It is only after the proposal has been submitted that the AC has a 30-day period to act. We do not believe that appellants can require the AC to act under the provision where they themselves did not fulfill their own initial duty to propose before building. They cannot expect strict compliance from the AC where they themselves did not strictly comply with the rule they want to enforce.

Finally, as the trial court noted, the Waltzes did supersede each of these proposals with a new one, effectively depriving the AC of the ability to act on them. Although the Waltzes argue that Mr. Firestone improperly forced them to do so by lying and usurping the authority of the AC, that does not take away from the fact that the Waltzes were the

21

ones who submitted the new plans. If they can show that the earlier plans would have been approved, then Firestone's actions actually harmed them. But, if the plans would have failed anyway, the fact that the Waltzes were duped into changing them did not matter.[8]

Just as the respondents could not use the changed plans as a shield against the claims made by the Waltzes, the appellants could not use the reasons the new plans were submitted as a sword against the respondents. Doing so would obscure their obligation in this case, which is to prove that they have been harmed by the change in plans because one of the plans would have won approval but for the actions of Mr. Firestone and/or the Board. That is the essence of this case. We cannot divine whether they would have won at trial if the proper standard of liability had been applied, which is why they are entitled to a new trial under the proper standard of care.

But just because they can show that respondents did not always behave properly throughout these proceedings, it does not mean that they have shown that respondents' actions have necessarily harmed them. There is plenty of blame to go around for both parties. The Waltzes acted precipitously in starting construction on changed plans

---

[8] It is unclear why the Waltzes submitted the August 2 plan if they actually preferred Wilson's plan. Although Firestone declared the voting "null and void," he did not in some manner void the plan as opposed to any vote that was then taking place. If they preferred the Wilson plan, then the rational approach would have been to await a vote on the proposal or submit that plan as their own rather than assuming it was now dead.

No. 31582-7-III
*Waltz & Miller v. Homeowner's Ass'n.*

without first seeking approval. The Board, or some of its members, appeared to have also acted without regard for the proper procedures owed the Waltzes. Not all of these failures by the two sides impacted the critical questions of causation and harm. The next trial will decide whether or not any of them did.

The trial court correctly rejected the argument that the AC's failure to act on the two plans amounted to approval of those plans. For reasons previously stated, however, we reverse the judgment and remand for a new trial.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Korsmo, J.

WE CONCUR:

Siddoway, C.J.

Fearing, J.

23